UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

**TIMOTHY LEE WINTON**,                                    Case No. 3:15-cv-00465-KI

              Plaintiff,                              OPINION AND ORDER

    v.

**CAROLYN W. COLVIN, Acting**
**Commissioner of Social Security**,

              Defendant.


    Nancy J. Meserow
    Law Office of Nancy J. Meserow
    7540 SW 51st Ave.
    Portland, OR 92219

           Attorney for Plaintiff


    Billy J. Williams
    Acting United States Attorney
    District of Oregon


Page 1 - OPINION AND ORDER

Janice E. Hebert
Assistant United States Attorney
1000 SW Third Ave., Ste. 600
Portland, OR 97204-2902

Erin F. Highland
Special Assistant United States Attorney
Office of the General Counsel
Social Security Administration
701 Fifth Ave., Ste. 2900 M/S 221A
Seattle, WA 98104-7075

       Attorneys for Defendant

KING, Judge:

Plaintiff Timothy Lee Winton brings this action pursuant to section 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g), to obtain judicial review of a final decision of the Commissioner denying plaintiff's application for a period of disability and disability insurance benefits ("DIB") as well as supplemental security income ("SSI"). I reverse the decision of the Commissioner and remand for further proceedings.

## BACKGROUND

Winton filed applications for DIB and SSI on December 8, 2011, alleging disability beginning July 30, 2009. The applications were denied initially and upon reconsideration. After a timely request for a hearing, Winton, represented by counsel, appeared and testified before an Administrative Law Judge ("ALJ") on January 13, 2014.

On August 19, 2014, the ALJ issued a decision finding Winton not disabled within the meaning of the Act and therefore not entitled to benefits. This decision became the final decision

of the Commissioner when the Appeals Council declined to review the decision of the ALJ on February 25, 2015.

## DISABILITY ANALYSIS

The Social Security Act (the "Act") provides for payment of disability insurance benefits to people who have contributed to the Social Security program and who suffer from a physical or mental disability. 42 U.S.C. § 423(a)(1). In addition, under the Act, supplemental security income benefits may be available to individuals who are age 65 or over, blind, or disabled, but who do not have insured status under the Act. 42 U.S.C. § 1382(a).

The claimant must demonstrate an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to cause death or to last for a continuous period of at least twelve months. 42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A). An individual will be determined to be disabled only if his physical or mental impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. 42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B).

The Commissioner has established a five-step sequential evaluation process for determining if a person is eligible for either DIB or SSI due to disability. The evaluation is carried out by the ALJ. The claimant has the burden of proof on the first four steps. *Parra v. Astrue*, 481 F.3d 742, 746 (9th Cir. 2007); 20 C.F.R. §§ 404.1520 and 416.920. First, the ALJ determines whether the claimant is engaged in "substantial gainful activity." 20 C.F.R.

§§ 404.1520(b) and 416.920(b).  If the claimant is engaged in such activity, disability benefits are

denied.  Otherwise, the ALJ proceeds to step two and determines whether the claimant has a

medically severe impairment or combination of impairments.  A severe impairment is one

"which significantly limits [the claimant's] physical or mental ability to do basic work

activities[.]"  20 C.F.R. §§ 404.1520(c) and 416.920(c).  If the claimant does not have a severe

impairment or combination of impairments, disability benefits are denied.

       If the impairment is severe, the ALJ proceeds to the third step to determine whether the

impairment is equivalent to one of a number of listed impairments that the Commissioner

acknowledges are so severe as to preclude substantial gainful activity.  20 C.F.R. §§ 404.1520(d)

and 416.920(d).  If the impairment meets or equals one of the listed impairments, the claimant is

conclusively presumed to be disabled.  If the impairment is not one that is presumed to be

disabling, the ALJ proceeds to the fourth step to determine whether the impairment prevents the

claimant from performing work which the claimant performed in the past.  If the claimant is able

to perform work she performed in the past, a finding of "not disabled" is made and disability

benefits are denied.  20 C.F.R. §§ 404.1520(f) and 416.920(f).

       If the claimant is unable to perform work performed in the past, the ALJ proceeds to the

fifth and final step to determine if the claimant can perform other work in the national economy

in light of his age, education, and work experience.  The burden shifts to the Commissioner to

show what gainful work activities are within the claimant's capabilities.  *Parra*, 481 F.3d at 746.

The claimant is entitled to disability benefits only if he is not able to perform other work.  20

C.F.R. §§ 404.1520(g) and 416.920(g).

**STANDARD OF REVIEW**

The court must affirm a denial of benefits if the denial is supported by substantial

evidence and is based on correct legal standards. *Molina v. Astrue*, 674 F.3d 1104, 1110 (9th Cir.

2012). Substantial evidence is "such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion" and is more than a "mere scintilla" of the evidence but less

than a preponderance. *Id.* (internal quotation omitted). The court must uphold the ALJ's

findings if they "are supported by inferences reasonably drawn from the record[,]" even if the

evidence is susceptible to multiple rational interpretations. *Id.*

**THE ALJ'S DECISION**

The ALJ found Winton suffered from substance abuse disorder, degenerative disk

disease, degenerative joint disease, and personality disorder. The ALJ found the following

impairments to be non-severe: twisted ankle, shortness of breath, cellulitis, hepatitis C, vision

difficulties, fractured clavicle, and depression. The ALJ concluded the following impairments

were not medically determinable: mild peripheral neuropathy, knee problems, hand troubles, left

shoulder impingement, restless leg syndrome, and other mental health disorders such as PTSD,

ADHD, and memory deficits.

Notably, the ALJ found Winton's mental impairments, when considered together with his

substance abuse disorder, met the requirements of listing 12.09 in 20 C.F.R. § 404, Subpart P,

Appendix 1.

Having concluded Winton was disabled the ALJ evaluated whether Winton would

continue to meet or equal any of the impairments in 20 C.F.R. § 404, Subpart P, Appendix 1 in

the absence of his substance abuse disorder, and concluded he would not. Instead, the ALJ

determined Winton would have the residual functional capacity ("RFC") to perform the following work if he stopped abusing substances:  occasionally lift 20 pounds, frequently lift 10 pounds, walk and sit consistent with light work, climb ramps and stairs frequently, climb ladders, ropes, and scaffolds occasionally, balance and crawl frequently, reach overhead with his bilateral arms occasionally, perform unskilled work, but avoid concentrated exposure to dangerous machinery and heights.  Given this RFC, the ALJ concluded Winton could not perform his past work, but could perform other work in the national economy such as ticket taker.

## FACTS

Winton was 46 years old on his alleged date of disability.  The last grade he completed was his sophomore year of high school, and he does not have a GED.  He last held a job as a forklift driver in 2009, which he performed for three years.  Before that job, he received training as a flagger and was certified in hazardous materials cleanup.  He also worked for a period of approximately five years at a Kentucky Fried Chicken restaurant, where he had worked his way up to chief supervisor.  He lost that job when he argued with his supervisor and yelled at a customer.

During his legal employment, Winton was also engaged in selling and consuming illegal drugs.  His history is best summed up by one of his doctors at Veteran's Affairs, when Winton asked for completion of a disability evaluation.  Dated January 9, 2014, Kelly McCann MD, Ph.D., wrote the following:

> His [disability] claims are for osteoarthritis and HepC.  Does having HepC (currently w/o complication) make one eligible for social security/disability?  He has chronic pain issues secondary to DJD, primarily secondary to traumatic injuries.  He's already been evaluated by a physician who specializes in SSD claims; the assessment was that he is able to do light work.

Primarily, the driver for getting SSD $ is obtaining housing.  Was discharged from the military for drugs and EtOH [after serving six months when he was 17 years old].  Prior occupation was dealing drugs x decades [since 1995].  His current income is food stamps and travel pay from VA (though one of the daily drug rehab programs recently discharged him after he relapsed on meth, so travel pay may be difficult to come by).  When he was living with his nephew rent-free, he sold his food stamps to obtain meth.

Regarding housing situations since I've known him:

- Was living in a trailer on father and step-mother's property.  Can't go back to father's home because step-mother is opposed, but ok to mail meds to father's home.
- Can't go to mother's home because she has dementia and is in assisted living.
- Can't go to nephew's home because that was the source of the meth.
- Can't go to White City because is a sex offender (statutory rape in 2006 of a 17 yo girl that he picked up in a bar).
- Can't go to sister's home because she has young children.
- Discharged from [Substance Abuse Treatment Program] housing for commenting on ladies' appearances.
- He's been involved in almost every homeless program in the city.  Kicked out of his favorite homeless shelter when they discovered he had a sword concealed in his cane.
- Currently lives at City Team International, which also provides food.  He has to get vouchers (at St Francis or Clark Center Transitional Program) or pay $5.
- Would like to get into Central City housing at the Henry.

He's well enough to go to/from shelters, food banks, and appointments, which might work in his favor.

Tr. 1751-52.

Winton completed a 30 day drug rehabilitation program in May 2010, and testified at the hearing to being clean and sober from that date until May 2013.  The evidence is to the contrary, however.  As early as October 2010, he reported active substance abuse, Tr. 452, which steadily worsened through 2010 and into 2011.  Tr. 388 (using meth when fell down in Nov. 2010), 448 (last used Nov. 4, 2010), 419 (reported in April 2011 use "steadily worse since May 2010"; last used Apr. 4, 2011).

Page 7 - OPINION AND ORDER

Winton stopped using from August 2011 until perhaps as early as March 2012. During that time he reported intermittent depression, diagnosed as "mild," with a good response to Celexa. Tr. 431, 445, 443, 435. He did display strange behavior in January 2012, described as "a bit tangential, rocking back and forth constantly." Tr. 564. Given his presentation, hepatitis C treatment was deemed not appropriate since he "appears to [have a] significant mental illness[.]" Tr. 567.

In January 2012, Winton's chronic neck pain and left foot numbness was evaluated. He displayed normal strength and normal gait, but he was prescribed gabapentin for his neck pain and an MRI of his lumbar spine was ordered to evaluate the left foot numbness. Tr. 580. The MRI was normal.

Winton was deemed not a good candidate for clean and sober vet housing at the Henry Building in February 2012 due to his past anger issues, assault charges, inability to identify negative consequences from using meth, and cognitive issues. He "was extremely tangential during the interview, although redirect able." Tr. 563.

In March 2012, Winton was impatient in the waiting room, getting up and then not sitting back down, and he was rocking in his chair; he looked slightly sedated and his speech was slurred. Erick Turner, M.D., Winton's VA psychiatrist, noted that Winton had told him he had been clean on that date, "but your urine came back positive for amphetamine in addition to pot." Tr. 870. Winton cancelled his appointment in May, and when Dr. Turner met with him in July, Winton admitted to drug use. Tr. 594, 872, 956.

Winton was clean in August and September 2012, and remained clean through March 2013. Tr. 614. During this time, he reported feeling angry towards his sister, forgetful, and

depressed, but providers characterized him as "friendly, and cooperative; speech/thoughts WNL; alert and oriented," able to remember "quite a bit of medical history," and "relaxed and talkative[.]"  Tr. 840, 842, 853, 795, 772, 809.  He continued to insist he had maintained sobriety since 2010, and that he had "one slip"due to stress.  Tr. 845.

In mid-March 2013, a provider at the Liver Clinic described Winton as "[d]oing very very well–participating in day treatment, smokes pot but no meth and only rare beer.  All of this is a big improvement for him, and he is pleased."  Tr. 743.

During his final relapse, he reported using meth again beginning in April 2013.  Tr. 1410.  On May 21, 2013, Dr. McCann described Winton as inappropriately "swig[ging]" his cough syrup and using his albuterol inhaler too often.  Tr. 679.  She described him as agitated, circumstantial, tangential, unusual/bizarre, "with a poorly-defined euthymic mental disorder," and reported being suspicious of drug use "but he's screened negative multiple times."  Tr. 683.  On May 28, 2013, he reported being banned from a shelter for six months for carrying a cane with a sword hidden inside, which was considered a weapon.  He was "calm and cooperative; thoughts/speech WNL; does not appear to be in distress; alert and oriented."  Tr. 668.  He tested positive for meth in July, and again in September.  Dr. Turner told him in August that he was receiving the maximum recommended dose of citalopram, and "the main thing he needs to do for his depression is to address his [substance abuse] problem."  Tr. 1459.  Winton was discharged from the VA's Residential Rehabilitation Treatment Program ("RRTP") on September 10, 2013 for being loud, disruptive, and threatening toward staff and other vets.

He finally tested negative for substances again on September 21, 2013 and remained sober through the date of the hearing in January 2014 and beyond.  Just a few days after

achieving sobriety, he asked about vocational rehabilitation, but did not qualify for positions due to his lack of experience and certifications. Winton then attempted to return to the VA's RRTP, but while discussing his inappropriate behavior Winton grew angry and began yelling over staff, pounding on the table, and putting his finger within inches of staff members' faces. He was discharged from the program on October 18, 2013. Tr. 1209.

He moved into a shelter. On November 1, 2013, his social worker described him as "calm, focused, and able to accept constructive feedback appropriately. He is not able to be those things when he is using." Tr. 1194. She opined, however, "Being a sex offender with a significant criminal history and having significant personality insight issues will limit him for desirable housing and success in finding work." Tr. 1195.

Less than two weeks later, another social worker described him as "tangential and speech was incoherent at times. Veteran was very talkative. Veteran appeared as though he could be intoxicated and has difficulty focusing. Veteran's mood was agitated and affect was congruent. Veteran has legal barriers that directly affect his employability. Veteran appeared to easily work himself up over events from the past." Tr. 1179. A few days later, a social worker declined to refer Winton to the VA's compensated work therapy ("CWT") program as she did not see him as "'readily employable' given his presentation today and his history." Tr. 1180. She was willing to refer him to a supportive job search program. She described Winton as appearing to be "intoxicated and was easily agitated when I was unable to grant his requests. Veteran raised his voice and I told him I was uncomfortable, at which point he left the interview room. Veteran is not appropriate for CWT at this time due to apparent substance abuse and inability to maintain appropriate behavior." *Id.* Just six days later he tested negative for amphetamines. Tr. 1066.

Winton requested a cane in mid-November 2013 because he was concerned about his balance and weaving while walking. A VA staff physician referred him to the VA Medical Center to pick up a cane. When Winton stopped at the clinic at the end of November, a physical therapist confirmed Winton was "in need of single point cane, due to abnormality of gait." Tr. 1104.

In mid-January 2014, Winton was investigating GED programs, and his thought process "was linear and goal oriented. Speech was clear and concise. Veteran's mood was positive and affect was congruent." Tr. 1743. Winton was accepted into clean and sober housing at the end of January 2014. He conceded his history of getting angry and reported he had been working on "learning to walk away when angry." Tr. 1718. He also agreed not to compliment women beyond a "generic you look nice[.]" *Id.*

In March 2014, after his hearing with the ALJ, he received treatment for swallowing problems, believed to be consistent with his "esophageal dysphagia, including reflux and dysmotility." Tr. 1595. He was warned about aspirating reflux after eating and drinking. His speech-language pathologist noted "distractibility/decreased self-monitoring[.]" Tr. 1595. He was also described as giving "[o]dd responses to questions at times, tangential in thoughts though answering orientation questions appropriately." Tr. 1638.

On April 7, 2014, psychologist Mark G. Dillon, Ph.D., examined Winton for VA disability benefits. Dr. Dillon noted Winton's "regular, but brief periods of depression that occur on an almost daily basis." Tr. 2072.[1] Dr. Dillon believed Winton's depression was the primary

---

[1] The ALJ did not receive medical records beyond March 20, 2014 and therefore did not have this report at the time she issued her decision.

diagnosis, while his substance abuse was secondary. Winton spent his days reading and

attending appointments. He had one friend he talked with on the phone once or twice a year. He

had been married three times and has six children, but he only had a close relationship with one

of his children. His other children did not believe he was clean and did not wish to be in contact

with him. Winton tended to give long, detailed responses to Dr. Dillon's questions that exceeded

the scope of the inquiry. He made minimal eye contact. He reported memory problems, but

could give details about his past and recent life. He did not demonstrate any psychological

distress during the interview. Dr. Dillon opined that Winton's ability to function at work was

impaired in specific ways.

　　　The May 2014 social worker note reflected Winton "worked well in the program," kept

his appointments, improved his health, and accessed support programs. Tr. 1984. When Dr.

McCann saw Winton in May, she described him as having a normal appearance, with appropriate

grooming, and a mental status that was "unusual/bizarre as usual." Tr. 1995. His depression

score had dropped in July, and he presented "much more appropriate than previous visits[.]" Tr.

1960. In August, he sought assistance for his sleep problems; he reported exercising during the

day, taking citalopram (40 mg) and buproprion (75 mg increased to 100 mg), and he had stopped

the gabapentin due to concerns about weight gain. He was in good spirits, alert and fully

oriented. Finally, in November, Winton was "well appearing," "[i]n good spirits," and he was

described as appropriate, comfortable, and pleasant. Tr. 1825, 1826.

**DISCUSSION**

Winton challenges the ALJ's decision on a number of grounds, including her analysis of the medical evidence, her RFC determination, her identification of Winton's severe impairments, and her conclusion about his credibility.

I.    Medical Evidence

Winton asserts the ALJ formulated the RFC by relying on her own opinions rather than on any medical evidence.  In addition, he argues Dr. Dillon's opinion, not provided to the ALJ before she issued her decision, undermines any substantial evidence supporting the ALJ's opinion.

A.    Evidence on Winton's Mental Impairments

The following physicians offered opinions about Winton's mental impairments:  Gary Sacks, Ph.D., Joshua J. Boyd, Psy.D., Sandra L. Lundblad, Psy.D., and Dr. Dillon.  Dr. Boyd and Dr. Lundblad found only mild impairments in social functioning and in maintaining concentration, persistence or pace.  Tr. 105, 120.  The ALJ noted substantial additional records, submitted since these doctors rendered their opinions, established Winton's severe mental impairments; as a result, she did not rely on these opinions.  Tr. 26.

Dr. Sacks evaluated Winton in April 2011; at that time, Winton described a "long history of methamphetamine abuse and dependence which have resulted in occupational and social interference throughout his life" but he reported no clinical depression.  Tr. 419.  Winton was not taking any medications at that time and his cognitive functioning was grossly intact.  The ALJ appears to have relied on Dr. Sacks opinion, in part, in concluding Winton's substance abuse disorder met section 12.09 of the listings.  However, because Dr. Sacks offered no "specific

Page 13 - OPINION AND ORDER

physical or mental functional limitations, with or without substance use" the ALJ gave his opinion little weight in crafting Winton's RFC.  Tr. 26.

Lacking any other medical opinions, the ALJ concluded Winton could perform unskilled work based on other substantial evidence in the record.  Importantly, Winton had worked before and had stopped working either to take care of his mother or because he had been fired for being arrested; Winton gave both stories, but either way he did not stop working because of any impairment.  His daily activities suggested he was capable of a great deal of activity, including walking, taking the bus, collecting cans, and reading.  Further, through June 2011, he cared for his blind, diabetic mother.  After achieving sobriety in September 2013, Winton investigated work opportunities through the VA, but did not qualify for several positions because of his lack of experience or certifications.  Tr. 1338.  Winton has a criminal history and an intermittent work history which posed employment problems.

Finally, as the ALJ pointed out, Dr. Turner, Winton's VA psychologist, suggested Winton's biggest problem was his substance abuse, implying that his depression would subside once he achieved sobriety.  Dr. McCann, Winton's physician, similarly questioned Winton's disability application, speculating that his motivation for applying was to obtain housing.  At the time the ALJ came to her conclusion, then, there was no conflicting medical evidence to undermine the ALJ's conclusion that Winton could perform unskilled, light work.  Thus, the ALJ's RFC was supported by substantial evidence in the record.  *Magallanes v. Bowen*, 881 F.2d 747, 756-57 (9th Cir. 1989) ("The limitation of evidence in a hypothetical question is objectionable only if the assumed facts could not be supported by the record."); SSR 96-8p, 1996 WL 374184, at *7 ("The RFC assessment must include a discussion of why reported symptom-

Page 14 - OPINION AND ORDER

related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence" and "The RFC assessment must always consider and address medical source opinions.  If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted.").

       B.       <u>Dr. Dillon</u>

The ALJ issued her opinion without considering Dr. Dillon's April 2014 opinion because she did not have records beyond March 20, 2014.  The Appeals Council considered Dr. Dillon's opinion, and other medical records between March 21, 2014 and December 2, 2014, and concluded none of the new evidence compelled a different result.  The Appeals Council concluded Winton was not disabled except during periods when impacted by his substance abuse disorder.

Additional evidence presented to the Appeals Council but not seen by the ALJ may be considered in determining if the ALJ's denial of benefits is supported by substantial evidence. *Harman v. Apfel*, 211 F.3d 1172, 1180 (9th Cir. 2000).  The court may not hold on the basis of the additional evidence, however, that the claimant is entitled to an immediate award of benefits. The case must be remanded to the ALJ for consideration of the new evidence, rebuttal by the Commissioner, and any additional testimony needed because of the new evidence.  *Id; but see Brewes v. Comm'r Soc. Sec. Admin.*, 682 F.3d 1162-63 (9th Cir. 2012) (remanding for a finding of disability).

Dr. Dillon opined that Winton's depression was his primary diagnosis, and his substance abuse was secondary.  Dr. Dillon opined that Winton's:

work functioning is impaired due to physical medical problems (for example, he has problems turning his head and walking), memory difficulties (he said that it is hard for him to recall directions or to learn new work related tasks), and his legal history.  He would likely have difficulties interacting appropriately with others on a regular basis and learning new tasks.  He would likely have to be very closely supervised in order to maintain his productivity.

Tr. 2075.

To the extent Winton asserts the Appeals Council was required to give reasons to reject Dr. Dillon's opinion, he is wrong.  20 C.F.R. § 404.970(b) (Appeals Council is required only to "consider the additional evidence" submitted by the claimant); *Gomez v. Chater*, 74 F.3d 967, 972 (9th Cir. 1996) (Appeals Council "not required to make any particular evidentiary finding" when it rejects evidence).  Instead, the question is "whether, in light of the record as a whole, the ALJ's decision was supported by substantial evidence and was free of legal error." *Taylor v. Comm'r of Soc. Sec. Admin.*, 659 F.3d 1228, 1232 (9th Cir. 2011) (citing *Ramirez v. Shalala*, 8 F.3d 1449, 1451-54 (9th Cir. 1993)).

The Commissioner concedes Dr. Dillon presents a more restrictive RFC, but contends his opinion is not supported by his own observations and improperly relies on Winton's complaints.  The Commissioner also contends Winton did not seek mental health treatment between January and November 2014, and when he was seen by providers he presented normally.  In response, Winton insists Dr. Dillon's opinion is supported by Dr. Dillon's reading of the VA records and by his own observations; Winton also urges the persuasiveness of Dr. Dillon's opinion as the only doctor to offer observations about Winton during a lengthy period of sobriety.

The Commissioner and Winton make valid arguments that must be properly weighed by the ALJ.  Since Dr. Dillon's opinion suggests the ALJ's RFC does not specify all of Winton's

limitations and restrictions, and raises a question about whether Winton could perform the jobs identified by the VE, the ALJ should resolve these conflicts. *Lingenfelter v. Astrue*, 504 F.3d 1028, 1045 (9th Cir. 2007) (cases involving conflicting medical opinions, which should be weighed by ALJ, should be remanded). I note a remand is especially appropriate here given the ALJ's findings on Winton's moderate limitation in social functioning, concentration, persistence and pace–findings which appear to be consistent with Dr. Dillon's opinion that Winton should limit his interactions with others and be supervised at work. If the ALJ does not accept Dr. Dillon's opinion, she should clarify how a limitation to unskilled work is consistent with her findings on Winton's moderate limitations in social functioning, concentration, persistence and pace. *See, Lubin v. Comm'r of Soc. Sec. Admin.*, 507 F. App'x 709, 712 (9th Cir. 2013) (unpublished) ("The ALJ must include all restrictions in the residual functional capacity determination and the hypothetical question posed to the vocation expert, including moderate limitations in concentration, persistence, or pace").

In sum, the evidence Winton submitted to the Appeals Council throws the ALJ's opinion into question; thus, the ALJ's conclusion that Winton could perform other work consistent with the RFC is not supported by substantial evidence.

II.    Severe Impairments

Winton argues the ALJ erred in failing to consider his depression, neuropathy, and daytime sleepiness as severe impairments. A medically determinable impairment must be established through signs, symptoms, and medically acceptable clinical or laboratory findings but under no circumstances can be established through symptoms, namely the individual's own

perception of the impact of the impairment, alone.  *Ukolov v. Barnhart*, 420 F.3d 1002, 1005 (9th

Cir. 2005).

Since I am reversing and remanding for the ALJ to consider Dr. Dillon's opinion, she

should also reconsider her determination about the severity of Winton's depression.[2]  Similarly,

the ALJ should evaluate the severity of Winton's sleep apnea, which he was diagnosed with in

October 2014, after the date of the decision.  Tr. 2100.

As for the ALJ's determination that Winton's neuropathy was not medically

determinable, because there was no etiology for it, Winton points out that the consulting

examiner diagnosed him with mild peripheral neuropathy, as did other physicians.  *See* Tr. 424,

507, 580.  The Commissioner argues only that the ALJ considered all of Winton's symptoms that

were consistent with the medical record, and that Winton did not identify any additional

limitations that should have been included in the RFC.  To the contrary, however, Winton did

identify additional limitations, including balance problems and a need for a cane to stand and

walk, which he argues directly affect the RFC and the VE's conclusions.

While I agree with Winton that the ALJ should have identified his peripheral neuropathy

as a medically determinable impairment, I question its severity.  Notably, the physicians who

identified the neuropathy noted also that it did not seem to bother Winton and that his gait was

normal.  Tr. 422, 424, 580.  Consulting examiner Patrick Radecki, M.D., concluded on

December 31, 2011, that Winton could perform work without standing, walking or sitting

limitations.  While the ALJ gave little weight to this opinion, she did so because additional

---

[2] The ALJ's finding about Winton's unchanging medication dosage is incorrect.  Tr. 17.
Winton started on 10 mg of citalopram, and his dosage was doubled in February 2012, and
doubled again in March 2012.  Tr. 446, 557, 553.

medical evidence suggested somewhat more protective sitting, standing and lifting limitations were necessary.  As for the cane, notably it was not provided to Winton until the end of 2013, almost two years after he was diagnosed with the peripheral neuropathy.  Tr. 1166-67.  The vast majority of the evidence in the record reveals a normal, strong, steady gait until November 2013, with the exception of his short time in the hospital in July 2013.  *Compare* Tr. 533, 543, 545, 577, 948, 957, 1213, 1232, 1243, 1257, 1276 *with* Tr.1001, 991, 979, 966, 957, 948.[3] Nevertheless, given the evidence since November 2013 that Winton required a cane, and that it was prescribed by a physician and deemed necessary by a physical therapist, the ALJ should reconsider her conclusion about Winton's need for a cane as of November 2013.  *See* Tr. 1104, 1623 (Mar. 12, 2014, "slow and steady gait observed using personal cane").

In sum, while the ALJ should assess whether depression and sleep apnea constitute severe impairments, and the effect those impairments have on Winton's functioning, the ALJ's error in addressing Winton's peripheral neuropathy was harmless.  Nevertheless, she should reconsider her determination about Winton's need for a cane as of November 2013 as there is substantial evidence in the record supporting the necessity for the cane.

III.    Credibility

Winton challenges the ALJ's credibility analysis.  When deciding whether to accept the subjective symptom testimony of a claimant, the ALJ must perform a two-stage analysis.  In the first stage, the claimant must produce objective medical evidence of one or more impairments which could reasonably be expected to produce some degree of symptom.  *Lingenfelter*, 504 F.3d

---

[3] Winton argues a strong, steady gait inside a hospital room is not the same as a strong, steady gait outside on the street, but this is just an alternate interpretation of the evidence.  *See Molina*, 674 F.3d at 1110.

at 1036.  The claimant is not required to show that the impairment could reasonably be expected to cause the severity of the symptom, but only to show that it could reasonably have caused some degree of the symptom.  In the second stage of the analysis, the ALJ must assess the credibility of the claimant's testimony regarding the severity of the symptoms.  *Id.*  The ALJ "must specifically identify the testimony she or he finds not to be credible and must explain what evidence undermines the testimony."  *Holohan v. Massanari*, 246 F.3d 1195, 1208 (9th Cir. 2001).  General findings are insufficient to support an adverse credibility determination and the ALJ must rely on substantial evidence.  *Id.*  "[U]nless an ALJ makes a finding of malingering based on affirmative evidence thereof, he or she may only find an applicant not credible by making specific findings as to credibility and stating clear and convincing reasons for each."  *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006).[4]

The ALJ gave numerous reasons to question Winton's credibility.  Three days before the hearing, he displayed a full range of motion in his neck, but he testified he had significant trouble turning his head.  Tr. 1729 (1/29/2014), 66 ("neck bothers me 24/7").  When Winton sought medical care in mid-October 2013, his doctors considered malingering or secondary gain to explain why the pain disappeared with a heat pack.  Tr. 1292.  Winton was fairly active during the relevant period, walking four or five miles to the consultative physical examination, and walking three times per week in 2012; he also cared for his mother through June 2011, and left his job in 2009 for a reason other than his impairments.  The record also soundly supports the

---

[4] The Commissioner suggests the clear and convincing standard need not control the analysis, encouraging application of the more deferential regulatory requirement for specific reasons supported by substantial evidence.  Def.'s Br. 13, n.1.  The Ninth Circuit has rejected her argument.  *See Burrell v. Colvin*, 775 F.3d 1133 (9th Cir. 2014) (reasserting that the ALJ must provide "specific, clear and convincing reasons" to support a credibility analysis).

ALJ's conclusion that Winton was participating in VA programs in order to collect travel pay. In fact, he was "open" about that. Tr. 1692. Finally, there is no doubt that Winton was not completely candid about his sobriety date, repeatedly reporting sobriety since May 2010 without acknowledging his relapses beginning in 2010 and into 2011, and again in 2012. These are all clear and convincing reasons to question Winton's credibility. *Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001) (medical evidence is still a relevant factor in determining the severity of the pain and its disabling effects); *Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008) (inconsistent statements, reputation for lying, daily activities all reasons to question testimony); *Thomas v. Barnhart*, 278 F.3d 947, 959 (9th Cir. 2002) (spotty work history a valid reason to reject testimony); *Tonapetyan v. Halter*, 242 F.3d 1144, 1148 (9th Cir. 2001) (a tendency to exaggerate symptoms is another valid reason to support a negative credibility finding); *Verduzco v. Apfel*, 188 F.3d 1087, 1090 (9th Cir. 1999) (lack of candor about substance abuse is a clear and convincing reason to question a claimant's credibility). While Winton gives a plethora of alternative ways to read the record, the ALJ's reading is just as rational. *Molina*, 674 F.3d at 1110.

However, the ALJ's summary of Winton's efforts to find work through the VA is only partially accurate. While he did indicate he was interested in working, and was denied due to lack of experience and certifications, the VA also decided he was not a viable candidate for CWT as he was not considered employable. Further, the ALJ's conclusion that Winton exaggerated his shortness of breath is undermined by Winton's hospitalization for pneumonitis, pulmonary hemorrhage, and viral pneumonia, his diagnosis of interstitial pulmonary edema, mild COPD, need for an inhaler, and coughing fits. *See* Pl's. Op. Mem. 31. I have already concluded above

that a doctor and physical therapist considered a cane appropriate to address Winton's stability

while walking.  Finally, I agree with Winton that the ALJ suggests Winton was not clean and

sober in mid-November 2013 (when he was described as appearing intoxicated by some of his

providers).  His hearing testimony was essentially consistent with the record.  *Compare* Tr. 65

(reported clean and sober date of September 10, 2013) *with* Tr. 1092 (medical record reflecting

negative drug test on September 21, 2013).

The fact that the ALJ improperly considered some reasons for finding plaintiff's

credibility undermined does not mean that the ALJ's entire credibility assessment is improper.

*Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1197 (9th Cir. 2004).  On the whole, the

ALJ gave clear and convincing reasons supported by substantial evidence in her assessment of

Winton's testimony.  The ALJ did not err.

IV.    Remedy

The court has the discretion to remand the case for additional evidence and findings or to

award benefits.  *McCartey v. Massanari*, 298 F.3d 1072, 1076-77 (9th Cir. 2002).  The court has

discretion to credit evidence and immediately award benefits if the ALJ failed to provide legally

sufficient reasons for rejecting the evidence, there are no issues to be resolved before a

determination of disability can be made, and it is clear from the record that the ALJ would be

required to find the claimant disabled if the evidence is credited.  *Garrison v. Colvin*, 759 F.3d

995, 1020 (9th Cir. 2014).  Alternatively, the court can remand for further proceedings "when the

record as a whole creates serious doubt as to whether the claimant is, in fact, disabled within the

meaning of the Social Security Act."  *Id.* at 1021.

Page 22 - OPINION AND ORDER

Remand is appropriate for the ALJ to address evidence she did not have in issuing her first decision, namely Dr. Dillon's opinion and the diagnosis of sleep apnea.  In addition, the ALJ should address the limitations, if any, caused by Winton's depression and his need for a cane as of November 2013.  I remand the case to the ALJ for consideration of the new evidence, rebuttal by the Commissioner, and any additional testimony needed because of the new evidence. *Harman*, 211 F.3d at 1180.

## CONCLUSION

The decision of the Commissioner is reversed.  This action is remanded to the Commissioner under sentence four of 42 U.S.C. § 405(g) for rehearing to further develop the record as explained above.  Judgment will be entered.

IT IS SO ORDERED.

DATED this _____1st_____ day of February, 2016.


    _/s/ Garr M. King_____
    Garr M. King
    United States District Judge

Page 23 - OPINION AND ORDER